280 So.2d 840 (1973)
TOWBOATS, INC. et al.
v.
GENERAL EQUIPMENT & IRON WORKS, INC.
No. 5565.
Court of Appeal of Louisiana, Fourth Circuit.
July 3, 1973.
Rehearing Denied August 7, 1973.
Terriberry, Carroll, Yancey & Farrell, Michael L. McAlpine, New Orleans, for plaintiff-appellee.
Meyer Sabludowsky, New Orleans, for defendant-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John O. Charrier, Jr., New Orleans, for Aeroquip Corp., third-party defendant-appellee.
*841 Wiedemann & Fransen, Clifton A. Adcox, New Orleans, for Bituminous Casualty Corp., defendant-appellee.
Gleason, Collins & Edrington, Samuel H. Collins, New Orleans, for Melville Equipment, Inc., third-party defendant-appellee.
Before REDMANN, SCHOTT, and BAILES, JJ.
SCHOTT, Judge.
This action was brought by plaintiffs, Towboats, Inc. and Federal Insurance Company, its subrogated insurer, against defendants, General Equipment & Iron Works, Inc., and its liability insurer, Bituminous Casualty Corporation, primarily for the cost of repairing a marine engine damaged as a result of the negligence of defendant, General Equipment. Towboats also sought damages for the loss of the use of its tug, Mustang, growing out of the damage to the engine. Towboats and Bituminous denied liability to plaintiffs and alternatively brought third-party demands against Aeroquip Corporation and Melville Equipment, Inc., and Bituminous denied coverage for the casualty based upon certain exclusions in the policy it had written for General Equipment. The trial judge awarded to Federal Insurance a judgment against General Equipment in the amount of $8634.00 for the damage done to the engine, dismissed the claim of Towboats for loss of use of its vessel, dismissed the claim against Bituminous and dismissed the third-party demands of General Equipment and Bituminous against Aeroquip and Melville. From this judgment only General Equipment has appealed and has limited its appeal to contentions that (1) the amount of the judgment is excessive, and (2) there was error in finding no coverage under the policy provided by Bituminous.
Towboats had been in the process of building the Mustang, and the engines, having been rebuilt by P&S Diesel Service, were ready for delivery. Towboats employed General Equipment to supply a crane and an operator to lift the engine from a flatbed truck on the wharf onto the Mustang which was moored at a bulkhead in the Violet Canal. The incident which gave rise to this litigation occurred in May, 1968, while General Equipment was performing this service. As one of the engines was above the hatch entering the hold of the vessel the boom gave way and the engine dropped into the hold and to the bottom of the vessel. The damaged engine was then taken back to P&S Diesel Service which made various repairs for the price of $1532.01. Robert M. Bayham, president of Towboats, was informed by representatives of P&S Diesel Service that the crankshaft had to be straightened and the "ear" on the engine block which accommodated a mounting bolt to serve the fresh water circulating pump had cracked off of the block, but that such damage did not require that a new block be installed. After these repairs were completed and the engine was delivered back to Towboats it was installed on the vessel and for the next several months work continued on the vessel preparing it for service. When the engine was started for the first time in September, 1968, the vessel's captain notified Bayham that a leak had developed in the water pump in the block, whereupon he inspected the engine and saw that the leak was just above the point where the pump had broken off of the block and the ear replaced. He notified his underwriter who in turn dispatched a marine surveyor, Arthur Terry, to survey the engine. In addition to the leakage they observed a wobble in the crankshaft. While Terry was of the opinion that the engine needed a new block, upon Bayham's insistence that he needed the vessel for a charter already made, it was decided to use the engine despite these symptoms of trouble. Bayham also contacted the P&S Diesel Service who advised that their ordinary 90-day warranty would not cover the work they had done in straightening the crankshaft or the repair of the block.
*842 Towboats proceeded to use the vessel for the next five months until the condition could no longer be coped with. They had used an automatic pump to feed water into the engine, but in spite of this and despite efforts of P&S to correct the problem, the leakage of water has never stopped. At this point in time the charterer was able to do without the vessel and it was brought to Boyce Machinery Corporation for further repairs. In due course a new crankshaft and a new block were installed on the engine.
The marine surveyor, Mr. Terry, on his first inspection of the engine on September 27, 1968, saw that the mounting lug serving the water pump had recently broken off, but at that time he saw no fracture in the block itself and he felt that Towboats could continue to outfit the vessel. But on October 9, 1968, he again surveyed the engine at the request of the underwriter and found a fracture in the block itself and in the area where the water pump is fitted to the engine. He noted the leakage of cooling water and rusted discoloration from coolant which had leaked before his inspection. In his opinion, although this fracture had not been initially discovered by him following the first repairs, it was nevertheless caused by the accident of dropping the engine, but since the owner was still anxious to continue it in service he proposed that a welding procedure be used to secure the leak temporarily, enabling the owner to use the vessel. He was concerned about the possibility of aggravating the present damage by using the engine and he felt that the block should be replaced, but because the owners were insistent upon using the vessel and replacing the engine later on when it was more convenient, and also because on inquiry he determined that there was no block replacement available at that time, he acquiesced in the use of the vessel with the admonition to the owner that if there were any aggravated damage caused by overheating or other causes, or if the fracture opened up in the block, the underwriter would not respond for any additional damage. On March 19, 1969, Terry again saw the engine after it had been brought to Boyce Machinery for the final repairs. Since he was convinced that certain of the repairs made were not related to the accident and since he found that some of them were a duplication of work already done at P&S Diesel Service the previous year, he eliminated certain items and concluded that the following were repairs which were necessary and caused by the dropping of the engine:

Removal and replacement of the engine and realignment thereof - $ 647.91
Crane service for removal and replacement of the engine - 192.42
Repairs of P&S Diesel Service in May, 1968 (out of a total of
$1517.28 were eliminated any items subsequently replaced again
by Boyce Machinery) - 461.24
Boyce Machinery repairs of March, 1969 - 7333.21
 ________
 Total $8634.78

Terry explained that under the insurance contract between Towboats and its underwriter it was the duty of the latter to replace the old block with a new block even though the damaged block was a rebuilt block in the first instance. The cost of a used block would be significantly less than that of a new block. Likewise, the cost of a used crankshaft would be 30 to 40% less than the price of a new crankshaft.
Defendants called the service supervisor of Boyce Machinery as their witness. He had seen the engine in March, 1969, and carried out instructions to install a new *843 block and a new crankshaft and to recondition the engine. In his opinion, a used block and crankshaft would cost approximately 60% of the cost of new material.
Turning first to General Equipment's contention that the damages awarded plaintiff were excessive, it takes the position that the only recovery to which plaintiff is entitled is the original invoice of P&S Diesel Service rendered for the work done in May, 1968, in the amount of $1532.00, since there was no proof that the crack in the block did not exist before the date of the accident. Likewise, defendant argues that the use of the engine from September 30, 1968, until March 3, 1969, aggravated the damage by continued use, and the subsequent repairs were necessary as a result of this aggravation and not the result of the original accident. But this contention is not supported by the evidence in the record. On the contrary, the opinion of Mr. Terry that the fracture of the block was the result of the accident was shared by the only witness called by the defendant, Gilbert Henry, the superintendent of Boyce Machinery.
As to the crankshaft, while Henry stated that this damage was the result of wear and tear, the record shows that 1) the crankshaft was damaged in the accident; 2) an attempt was made by P&S Diesel to straighten the crankshaft in May, 1968; but 3) when the engine was first run in September, both Mr. Bayham and Mr. Terry noticed that it had not been properly straightened; and 4) when P&S Diesel was notified of this they advised that this was the best they could do and specifically that their usual warranty did not apply on their attempt to straighten the crankshaft. From this testimony it seems clear that the damage to the crankshaft, necessitating its replacement in March, 1969, was in fact the result of the accident and not the result of the use of the vessel following the accident. Finally, with respect to the various invoices presented we are impressed with the testimony of Mr. Terry to the effect that he carefully eliminated any items which were duplications and any items which were not related to the original accident but which were attributable to the use of the engine, and there is nothing in the record to contradict his testimony to that effect.
Defendants also contend that they should not be cast in judgment for the cost of a new block and a new crankshaft since the original engine was rebuilt and had a used block and used crankshaft when the accident happened. The only evidence in the record bearing on this issue is the testimony of Mr. Terry and Mr. Henry, witnesses of plaintiff and defendant respectively, and their testimony is in agreement to the effect that the cost of a used block and used crankshaft would be just 60% of the price of the new. Since they were both able to offer a comparison in the prices of new versus old materials the inference follows that used equipment such as this must be available on the market. Judgment includes the cost of the new block at $3197.01 and the new crankshaft at $1334.52, for a total of $4531.53, 60% of which would amount to $2718.91, or a difference of $1812.61. Defendant is entitled to have the judgment reduced by that amount.
Finally, with reference to General Equipment's claim that Bituminous afforded coverage under its policy, one which excludes liability for property damage "arising out of the ownership, maintenance, operation or use, loading or unloading of any watercraft," and the other which excludes liability for property damage to "property in the care, custody, or control of the insured, or as to which the insured is for any purpose exercising control."
This accident occurred because the boom of the crane gave way under the excess weight of the engine. While an attempt was made by General Equipment to show that employees of Towboats in directing the crane operator as to where to set the *844 engine down and in assisting the crane operator by hooking on lines of the crane to the engine and by holding guide lines while the engine was hoisted and before the boom fell, thereby suggesting that the engine was under the control of the employees of Towboats and not of its own employees when the accident occurred, this argument has no merit. The crane itself and the boom which gave way under the excessive weight were under the control of the crane operator. The accident occurred because of negligence on the part of defendant in exceeding the safe capacity of the crane. Under these circumstances, the exclusion clearly applies and Bituminous extended no coverage for the loss which is the subject of this suit.
Accordingly, the judgment appealed from is affirmed but is amended so that there is judgment in favor of Federal Insurance Company and against General Equipment & Iron Works, Inc. in the sum of $6822.17, with legal interest from date of judicial demand and until paid and for all costs, except that costs of this appeal are to be borne equally between Federal Insurance and General Equipment.
Amended and affirmed.
REDMANN, J., dissents with written reasons.
REDMANN, Judge (dissenting in part).
The insurer here sold something its form (L6180X) calls "Comprehensive General Liability Insurance".
The policy's exclusion is of "property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; * * *".
The apparent purpose of this exclusion is to negate insurance for property of the kind which an insured might ordinarily own (whose damage would cause him loss but no liability), even though the insured may have elected to rent, rather than own, the equipment (and thus might have liability towards the owner); and, indeed, under whatever form an insured might use property of others (rather than owning), the same purpose of excluding coverage appears. It appears to reinforce the liability, as opposed to casualty, character of the insurance.
In this light the clause on care, custody or control or "is * * * exercising physical control" might be interpreted as a further assertion of the no-casualty-coverage purpose.
Our case is not one of property being used or controlled by the insured rather than owned. In my opinion the "Comprehensive General Liability" policy should be interpreted to cover this kind of liability.
However, if the insurer is entitled to a rigid literal interpretation, it must overcome the circumstance that in fact, if insured (rather than the marine engine's owner) was previously exercising control over the marine engine being lowered into the hull, once the crane broke the insured's "physical control" was literally ended. Insured's negligence may have occurred while it was exercising control, but the damage did not; and, as pointed out in Eymard v. C & W Well Servicing, Inc., 258 So.2d 406, 408 (La.App.1972), writ refused 261 La. 465, 259 So.2d 915, "It is not damage resulting from exercising control, but damage while exercising control, which is excluded."
The insurer should be held liable.